## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| CURTIS BORCHARDT, Derivatively on Behalf of Nominal Defendant BB&T CORPORATION, | ) ) ) CASE NO. _____ |
| | ) |
| Plaintiff, | ) **VERIFIED SHAREHOLDER** ) **DERIVATIVE COMPLAINT** |
| v. | ) |
| | ) |
| KELLY S. KING, CHRISTOPHER L. HENSON, DARYL N. BIBLE, BARBARA F. DUCK, CLARKE R. STARNES, EDWARD D. VEST, JOHN A. ALLISON IV, JENNIFER S. BANNER, ANNA R. CABLIK, NELLE RATRIE CHILTON, RONALD E. DEAL, TOM D. EFIRD, BARRY FITZPATRICK, J. LITTLETON GLOVER, L. VINCENT HACKLEY, JANE P. HELM, JOHN P. HOWE III, JAMES H. MAYNARD, ALBERT O. MCCAULEY, J. HOLMES MORRISON, NIDO R. QUBEIN, TOM SKAINS, TOMMY THOMPSON, STEPHEN WILLIAMS and E. RHONE SASSER, | ) ) ) ) ) ) ) ) ) ) ) ) ) **JURY TRIAL DEMANDED** ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants, | ) |
| and | ) ) |
| BB&T CORPORATION, | ) ) |
| | ) |
| Nominal Defendant. | ) ) |

Plaintiff Curtis Borchardt ("Plaintiff") by the undersigned attorneys, submits this Verified Shareholder Derivative Complaint (the "Derivative Complaint") on behalf of nominal defendant BB&T Corporation ("BB&T" or the "Company") against the defendants named herein.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought for the benefit of nominal defendant BB&T against certain current and former members of its Board of Directors (the "Board") and certain of the Company's current and former executive officers, seeking to remedy defendants' breaches of fiduciary duties.

2.    The Individual Defendants (defined herein) breached their fiduciary duties by, among other things, knowingly causing and/or knowingly allowing Company brokers and/or brokers of BB&T subsidiary Scott & Stringfellow, Inc. ("Scott & Stringfellow") to make false statements to customers and omit material information in connection with the sale of auction rate securities ("ARS").

3.    BB&T and Scott & Stringfellow served as underwriters in the ARS market, as well as managing broker-dealer for a number of ARS issuances. Upon information and belief, throughout 2007 and into 2008, BB&T and/or Scott & Stringfellow brokers knowingly misstated to customers the liquidity and safety of ARS and the ARS market, maintaining that ARS were safe, liquid and rarely failed. Upon further information and belief, at the time these brokers were making such statements, BB&T and Scott & Stringfellow were manipulating and artificially supporting the ARS market to make it appear liquid, even though defendants knew that the market was illiquid and in the midst of collapse.

4.    On or about February 13, 2008, BB&T and Scott & Stringfellow ceased bidding on ARS, resulting in pervasive auction failures and leaving customers holding illiquid securities. Upon information and belief, neither BB&T nor Scott & Stringfellow has offered to buy back the illiquid ARS from their customers.

5.    As a result of these illicit activities, on or about November 4, 2009, Dow Corning Corporation ("Dow Corning") and Hemlock Semiconductor Corporation ("Hemlock")

- 2 -

(collectively, the "Customer Plaintiffs") filed a complaint (the "Customer Complaint") against BB&T and Scott & Stringfellow. The Customer Complaint asserts, among other things, violations of the Securities Exchange Act, along with common law fraud and negligent misrepresentation and omissions. According to the Customer Complaint, the Customer Plaintiffs hold approximately six hundred sixty-seven million dollars ($667,000,000) of illiquid ARS from the Company and Scott & Stringfellow.

6.     The Customer Complaint seeks, among other things, a court order rescinding the investments with BB&T and Dow Corning, a return of the funds to Dow Corning and Hemlock, ongoing disgorgement of all profits earned by the Company and Scott & Stringfellow through the purchase and sale of ARS on behalf of the Customer Plaintiffs, and compensatory and punitive damages.

7.     As a result of the Individual Defendants' misconduct, BB&T has sustained damages, including, but not limited to, costs and expenses incurred in connection with the legal action taken against the Company, as well as further investigation of the unethical and illicit activities.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

9.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the

Case 1:10-cv-00261-WO-JLW   Document 1   Filed 04/01/10   Page 3 of 21

wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

10.     Plaintiff is a shareholder of BB&T, was a shareholder of BB&T at the time of the wrongdoing alleged herein, and has been a shareholder of BB&T continuously since that time. Plaintiff is a citizen of the State of California.

11.     Nominal Defendant BB&T is a North Carolina corporation with its principal executive offices located at 200 West Second Street, Winston-Salem, North Carolina 27101. According to its public filings, BB&T operates as the holding company for Branch Banking and Trust Company, which provides banking and trust services for small and mid-size businesses, public agencies, local governments, and individuals. Scott & Stringfellow is a wholly-owned subsidiary of BB&T.

12.     Defendant Kelly S. King ("King") serves as the Company's President, Chief Executive Officer ("CEO") and Chairman. King has served as BB&T's CEO since January 1, 2009 and as Chairman since January 1, 2010. Previously, King served as the Company's Chief Operating Officer ("COO") from 2004 to 2008. King is a citizen of the State of North Carolina.

13.     Defendant Christopher L. Henson ("Henson") has served as BB&T's COO since January 1, 2009. Henson served as the Company's Senior Vice President and Chief Financial Officer ("CFO") from July 2005 to December 2008, and as the Company's Assistant CFO from July 2004 to June 2005. Henson is a citizen of the State of North Carolina.

14.     Defendant Daryl N. Bible ("Bible") has served as BB&T's Senior Vice President and CFO since January 1, 2009. Bible served as the Company's Assistant CFO from January

- 4 -

2008 to December 2008. Upon information and belief, Bible is a citizen of the State of North Carolina.

15. Defendant Barbara F. Duck ("Duck") serves as BB&T's Senior Executive Vice President and Enterprise Risk Manager. Duck has been a member of the Company's executive management team since 2003. Duck is a citizen of the State of North Carolina.

16. Defendant Clarke R. Starnes III ("Starnes") has served as BB&T's Senior Executive Vice President and Chief Risk Officer since July 1, 2009. Starnes became the Company's Chief Credit Officer in September 2008, and was the Company's Specialized Lending Manager between January 2000 and August 2008. Starnes is a citizen of the State of North Carolina.

17. Defendant Edward D. Vest ("Vest") served as BB&T's Executive Vice President and Corporate Controller from August 2003 until September 1, 2009. Vest is a citizen of the State of North Carolina.

18. Defendants King, Henson, Bible, Duck, Starnes and Vest are collectively referred to hereinafter as the "Officer Defendants."

19. Defendant John A. Allison IV ("Allison") has served as a director of the Company since 1986. Allison served as BB&T's Chairman from 1989 until January 1, 2010, and as the Company's CEO from 1989 until December 2008. Allison is a member of the Executive and Risk Management Committee of the Board. Allison is a citizen of the State of North Carolina.

20. Defendant Jennifer S. Banner ("Banner") has served as a director of the Company since 2003. Banner is a member of the Compensation Committee of the Board and the Nominating and Corporate Governance Committee of the Board. Additionally, Banner is the

- 5 -

Designated Financial Expert of the Audit Committee of the Board. Banner is a citizen of the State of Tennessee.

21. Defendant Anna R. Cablik ("Cablik") has served as a director of the Company since 2004. Cablik is a member of the Audit Committee. Cablik is a citizen of the State of Georgia.

22. Defendant Nelle Ratrie Chilton ("Chilton") served as a director of the Company from 2000 until December 31, 2009. Chilton was Chairman of the Nominating and Corporate Governance Committee and a member of the Compensation Committee. Chilton is a citizen of the State of West Virginia.

23. Defendant Ronald E. Deal ("Deal") has served as a director of the Company since 1986. Deal is Chairman of the Compensation Committee and a member of the Nominating and Corporate Governance Committee. Deal is a citizen of the State of North Carolina.

24. Defendant Tom D. Efird ("Efird") served as a director of the Company from 1982 until December 31, 2009. Efird was Chairman of the Compensation Committee and a member of the Nominating and Corporate Governance Committee. Efird is a citizen of the State of North Carolina.

25. Defendant Barry Fitzpatrick ("Fitzpatrick") has served as a director of the Company since 2003. Fitzpatrick is a member of the Executive and Risk Management Committee. Fitzpatrick is a citizen of the Commonwealth of Virginia.

26. Defendant J. Littleton Glover ("Glover") has served as a director of the Company since 2009. Glover is a member of the Compensation Committee and the Nominating and Corporate Governance Committee. Glover is a citizen of the State of Georgia.

27.    Defendant L. Vincent Hackley ("Hackley") has served as a director of the Company since 1992. Hackley is a member of the Audit Committee. Hackley is a citizen of the State of North Carolina.

28.    Defendant Jane P. Helm ("Helm") has served as a director of the Company since 1997. Helm is the Designated Financial Expert of both the Compensation Committee and the Nominating and Corporate Governance Committee. Helm is a citizen of the State of North Carolina.

29.    Defendant John P. Howe, III ("Howe") has served as a director of the Company since 2005. Howe is Chairman and Designated Financial Expert of the Audit Committee. Howe is a citizen of Washington, D.C.

30.    Defendant James H. Maynard ("Maynard") has served as a director of the Company since 1985. Maynard is the Chairman and Designated Financial Expert of the Executive and Risk Management Committee. Maynard is a citizen of the State of North Carolina.

31.    Defendant Albert O. McCauley ("McCauley") has served as a director of the Company since 1993. McCauley is a member of the Audit Committee. McCauley is a citizen of North Carolina.

32.    Defendant J. Holmes Morrison ("Morrison") has served as a director of the Company since 2000. Morrison is a member of the Executive and Risk Management Committee. Morrison is a citizen of the State of West Virginia.

33.    Defendant Nido R. Qubein ("Qubein") has served as a director of the Company since 1990. Qubein is a member of the Executive and Risk Management Committee. Qubein is a citizen of the State of North Carolina.

- 7 -

34.     Defendant Tom Skains ("Skains") has served as a director of the Company since 2009.  Skains is a member of the Nominating and Corporate Governance Committee and the Compensation Committee.  Skains is a citizen of the State of North Carolina.

35.     Defendant Tommy Thompson ("Thompson") has served as a director of the Company since 2008.  Thompson is a member of the Compensation Committee and the Nominating and Corporate Governance Committee.  Thompson is a citizen of the Commonwealth of Kentucky.

36.     Defendant Stephen Williams ("Williams") has served as a director of the Company since 2007.  Williams is the Designated Financial Expert of the Audit Committee. Williams is a citizen of the State of North Carolina.

37.     Defendant E. Rhone Sasser ("Sasser") served as a director of the Company from 1997 until December 31, 2007.  Sasser was a member of the Executive and Risk Management Committee.  Sasser is a citizen of the State of North Carolina.

38.     Defendants Allison, Banner, Cablik, Chilton, Deal, Efird, Fitzpatrick, Glover, Hackley, Helm, Howe, Maynard, McCauley, Morrison, Qubein, Skains, Thompson, Williams and Sasser are collectively referred to hereinafter as the "Director Defendants."

39.     Defendants King, Henson, Bible, Duck, Starnes, Vest, Allison, Banner, Cablik, Chilton, Deal, Efird, Fitzpatrick, Glover, Hackley, Helm, Howe, Maynard, McCauley, Morrison, Qubein, Skains, Thompson, Williams and Sasser are collectively referred to hereinafter as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

40.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company and its subsidiaries, the Individual Defendants owed the Company and its shareholders fiduciary

- 8 -

obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company and its subsidiaries in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and its subsidiaries and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

41.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

42.     To discharge their duties, the Individual Defendants, as officers and directors of the Company, were required to exercise prudent and reasonable supervision over the management, policies, practices and controls of the Company and its subsidiaries. By virtue of such duties, the officers and directors of the Company were required to, among other things:

      a.     exercise good faith in ensuring that the affairs of the Company and its subsidiaries were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business; and

      b.     exercise good faith in ensuring that the Company and its subsidiaries were operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of their legal authority.

43.     The Individual Defendants, and all employees of BB&T, were required to comply with the BB&T Code of Ethics. The Code of Ethics states, in relevant part:

This Code embodies the basic principles, policies and laws that govern our actions when dealing with BB&T clients, prospective clients, vendors, fellow employees and others with whom we have contact personally and in a business

- 9 -

context. The Code applies equally to all employees of BB&T and its subsidiaries, and it is our expectation that consultants, independent contractors and agents working with BB&T will also adhere to the tenets of this Code. In this regard, each such BB&T representative is responsible for:

- Complying, both in spirit and by the letter, with the Code, including all applicable laws, regulations, and company policies and procedures
- *Promptly identifying and properly resolving ethical issues*
- *Reporting violations, or suspected violations, of the Code, laws, regulations, or company policy and procedures to the appropriate internal representative*
- Annually certifying compliance with the Code

\* \* \*

**Fiduciary Obligations**
*BB&T acts as a fiduciary in certain financial related transactions with its clients, including serving as trustee and investment advisor. If you are responsible for performing fiduciary services on behalf of BB&T, you have a legal duty to act in the best interests of BB&T's client. This means that you, as BB&T's representative, must always put the client's interests ahead of your own interest and that of BB&T.* As a fiduciary representative, you are further obligated to promptly disclose to the client any actual or potential conflict of interest.

\* \* \*

**Fair Treatment**
*BB&T is committed to dealing fairly with its clients, consultants, vendors, competitors and employees. No employee may take unfair advantage of anyone through manipulation, concealment, abuse of confidential information, misrepresentation of material facts, or any other unfair dealing practice.*

\* \* \*

Concerns regarding (1) accounting, internal accounting controls or auditing matters, (2) evidence of a material violation by BB&T or any of its officers, directors, employees or agents of federal or state securities laws, or (3) a material breach of fiduciary duty arising under federal or state law should be reported in accordance with the BB&T Corporation Policy and Procedures for Accounting and Legal Complaints. Violations or suspected violations involving the Senior Financial Officers' Code or the Directors' Code should be reported to the BB&T General Counsel for referral to the Board of Directors of BB&T Corporation. [Emphasis added. Internal numbering omitted.]

- 10 -

44.     Due to their positions as CEO, CFO and Controller, Defendants King, Henson,

Bible, Vest and Allison were required to comply with the BB&T Corporation Supplemental

Code of Ethics for Senior Financial Officers. The Supplemental Code states, in relevant part:

> **The Chief Executive Officer, Chief Financial Officer and Controller of BB&T Corporation (the "Senior Financial Officers") are responsible for the promotion of and adherence to the highest ethical standards of conduct in managing BB&T's financial operations and overseeing its compliance with laws, regulations and rules.** Accordingly, each Senior Financial Officer must comply with the BB&T Code of Ethics, which is applicable to all BB&T officers and employees, and with the provisions of this Supplemental Code of Ethics for Senior Financial Officers. To the extent any provision in this Code differs from or is in conflict with any provision contained in the BB&T Code of Ethics, the Senior Financial Officers shall comply with the provision of this Code.
>
> *          *          *
>
> **Reporting Code and Legal Violations.** Any violation or suspected violation of this Code or the BB&T Code of Ethics that involves a Senior Financial Officer, or any information concerning a material violation of securities laws or regulations, or other laws, regulations or rules applicable to BB&T and its business operations, must be promptly reported to the General Counsel and/or the Audit Committee.
>
> **Disciplinary Measures.** Any violation or suspected violation of the BB&T Code of Conduct or this Code by a Senior Financial Officer shall be reported to the Board of Directors of BB&T by the General Counsel or Audit Committee, as appropriate, and the Board shall take such action as it deems necessary in its sole discretion, with or without investigation, to deter wrongdoing and to promote accountability by Senior Financial Officers for adherence to such Codes. As and when warranted, the Board of Directors shall provide the Senior Financial Officer(s) involved in the disciplinary matter with written notice of the Board's findings and shall include, as appropriate, any corrective action(s) which may be imposed, including, without limitation, censure, demotion, reassignment, suspension with or without pay or benefits, and/or termination of employment. In determining the appropriate corrective action in a particular case, the Board of Directors shall take into account all relevant information, including the nature and severity of the violation or potential violation, whether the violation or potential violation was a single occurrence or involved repeated occurrences, whether the violation or potential violation appears to have been intentional or inadvertent, whether the Senior Financial Officer(s) involved should have known of or had been advised prior to the violation or potential violation as to the proper course of action, and whether the Senior Financial Officer(s) had committed other violations or potential violations in the past. In cases of illegal activity or wrongdoing, the Board of Directors (or its designee) will notify the appropriate legal authorities. [Emphasis added. Internal numbering omitted.]

- 11 -

45. The BB&T Corporation Corporate Governance Guidelines (As Amended on January 26, 2010) set out a number of goals and responsibilities of the Board. The guidelines state that BB&T has adopted ten corporate values to provide the foundation for the Company's corporate culture and to promote "the highest ethical conduct among its directors, officers and employees." These values are listed as: Honesty, Integrity, Justice, Reason, Independent Thinking, Reality, Productivity, Teamwork, Self-Esteem and Pride. According to the guidelines, the Board's primary functions include acting in the best interest of BB&T and its shareholders, setting forth a climate of "corporate trust, confidence and overall transparency." Moreover, the Board is charged with overseeing and evaluating internal control systems, processes and risk management policies.

46. The Director Defendants were required to comply with the BB&T Code of Ethics for Directors. This code specifically states that the Company is "committed to dealing fairly with its clients, consultants, vendors, competitors and employees." It further states that directors are not permitted to "take unfair advantage of anyone through manipulation, concealment, abuse of confidential information, misrepresentation of material facts, or any other intentional unfair-dealing practice."

47. As members of the Executive and Risk Management Committee, defendants Allison, Fitzpatrick, King, Maynard, Morrison, Qubein and Sasser were bound by the Charter of the Executive & Risk Management Committee of the Board of Directors of BB&T Corporation. This charter states that "the Committee shall review the Corporation's processes, and review and approve policies for identifying, assessing, monitoring and managing credit risk, liquidity risk, market risk, operational risk, reputational risk and business strategy risk." The charter then sets forth a list of specific duties of the committee, which include, but are not limited to, review of:

- 12 -

Investment Portfolio Reports; Asset & Liability Management Reports; Liquidity and Contingency Funding Management Reports; Loan Portfolio and Mortgage Banking Reports; Operational Risk Management Reports; and Enterprise Risk Management Reports.

48.     As members of the Audit Committee, defendants Cablik, Hackley, Howe, McCauley and Williams were bound by the Charter of the Audit Committee of the Board of Directors of BB&T Corporation.  One of the responsibilities of the Audit Committee is to ensure that the Company complies with all legal and regulatory requirements.  Similarly, the Audit Committee Charter states that committee members are to meet with the Company's CFO to discuss "any issues that may have a material impact on the Company's compliance with state and federal laws, rules, regulations or the standards or codes of conduct of self-regulatory organizations applicable to the Company's activities."

49.     As members of the Nominating and Corporate Governance Committee, defendants Deal, Glover, Banner, Helm, Skains, Thompson, Chilton and Efird were bound by the Charter of the Nominating and Corporate Governance Committee of the Board of Directors of BB&T Corporation.  This charter states that committee members shall "periodically review, recommend changes, consider exceptions, and monitor compliance with the Code of Ethics for Directors, the Code of Ethics for Senior Financial Officers and other written corporate governance policies."

## SUBSTANTIVE ALLEGATIONS

### Background

50.     ARS are long term, variable rate bonds tied to short term interest rates. ARS have a long term nominal maturity with interest rates reset periodically through a bidding process known as a Dutch auction.

- 13 -

51. At a Dutch auction, the total number of shares available to auction at any given period is determined by the number of existing bond holders who wish to sell or hold bonds only at a minimum yield. Each bid and order size is ranked from lowest to highest minimum bid rate. The lowest bid rate at which all the shares can be sold at par establishes the interest rate, otherwise known as the "clearing rate." This rate is paid on the entire issue until the next auction. Dutch auctions are typically held every 7, 14, 28, or 35 days.

52. ARS are risky because auctions may "fail." A "failed" auction may occur when there are more sellers than buyers, and the rate paid on the securities then is called a "fail rate." In this event, all holders, including those that submitted a sell, must hold securities until the next successful auction, which may not occur for an indeterminate period of time, possibly until maturity or perpetually, with the holders having no ability to access their money.

53. BB&T and Scott & Stringfellow served as both underwriters and broker-dealers in the ARS market. When acting as the sole manager, BB&T (or Scott & Stringfellow) was the only firm that could submit bids in an auction on behalf of its clients and/or other broker dealers who wanted to buy and/or sell ARS. When acting as lead manager, BB&T (or Scott & Stringfellow) was the primary firm that would submit bids in the auction, although other broker-dealers were able to submit orders on behalf of their clients. BB&T and Scott & Stringfellow received fees for managing and/or underwriting the auctions.

54. Upon information and belief, BB&T and Scott & Stringfellow marketed ARS to their customers as highly-liquid, highly-rated and secure investments equivalent to cash. Further, their brokers told customers that ARS were safe, liquid and that ARS auctions rarely failed.

- 14 -

55.     Upon further information and belief, beginning in the Fall of 2007, defendants knew that the risks of failures in the credit markets had greatly increased. Nonetheless, they continued to market ARS as before; that is, as safe and liquid. These positive assessments of the ARS market continued into February of 2008.

56.     However, on February 13, 2008, BB&T and Scott & Stringfellow stopped bidding on ARS at auctions, causing pervasive auction failures. This left customers of both companies holding illiquid securities.

### The Customer Complaint

57.     On or about November 4, 2009, Dow Corning and Hemlock filed the Customer Complaint against BB&T and Scott & Stringfellow. The Customer Plaintiffs assert that from some time prior to 2005 until February 13, 2008, they bought ARS from the Company and Scott & Stringfellow (including from Scott & Stringfellow broker Jeff Boyd).

58.     The Customer Plaintiffs contend that they relied on BB&T's and Scott & Stringfellow's "knowledge, skill, judgment and expertise in purchasing ARS recommended to them" by the Company and Scott & Stringfellow. On a similar note, the Customer Plaintiffs contend that due to their position as underwriters and auction managers, the individuals associated with BB&T and Scott & Stringfellow had "knowledge of the conditions of the ARS auction market that [the Customer Plaintiffs] did not, and could not have."

59.     The Customer Complaint asserts that BB&T's and Scott and Stringfellow's representations about ARS liquidity and risks (including, but not limited to, the contentions that they were highly-liquid, highly-rated and secure) were patently untrue statements of material fact. The Customer Plaintiffs contend that BB&T and Scott & Stringfellow "misrepresented the risk that the auctions would fail and failed to disclose the fact that the ARS market was

artificially sustained by the continued bidding and purchasing by Defendants and other broker-dealers and that the cessation of their bidding and purchasing practices would immediately render all ARS illiquid."

60.     The Customer Plaintiffs contend that between Fall 2007 and February 2008, the Company and Scott & Stringfellow increased their own inventory of ARS, even though they were well aware of the increased risk of a widespread failure of the ARS market. Nonetheless, during this time no individual from BB&T or Scott & Stringfellow ever disclosed any of the risks of the ARS market to the Customer Plaintiffs, and in fact continued to aggressively market ARS holdings as "very safe."

61.     On February 13, 2008, when BB&T and Scott & Stringfellow stopped bidding on ARS at auctions, pervasive auction failures resulted. The Customer Plaintiffs were thus left holding approximately six hundred sixty-seven million dollars ($667,000,000) of illiquid ARS from the Company and Scott & Stringfellow.

62.     The Customer Complaint states in the loss causation section that "Defendants engaged in a comprehensive scheme and course of conduct to manipulate for their own benefit an artificial market for ARS to inflate the perceived value of ARS and to generate underwriting fees and auction management fees to the detriment of [the Customer Plaintiffs]." Further, the Customer Complaint states that "Defendants' conduct operated as a fraud by, among other things, sending a false pricing signal to the ARS market, creating a false impression of the supply and demand for ARS, and omitting to disclose material foreseeable risks concerning the market for ARS and the value, safety and liquidity risk of those investments."

63.     The Customer Complaint asserts, among other things, violations of the Securities Exchange Act, along with common law fraud and negligent misrepresentation and omissions.

- 16 -

The Customer Complaint seeks, among other things, an order rescinding the investments with BB&T and Scott & Stringfellow, a return of the funds to Dow Corning and Hemlock, ongoing disgorgement of all profits earned by the Company and Scott & Stringfellow through the purchase and sale of ARS on behalf of the Customer Plaintiffs, and compensatory and punitive damages.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

64.    The Individual Defendants, through their attendance at Board meetings, committee meetings, management meetings and conversations with the Company's management, knew that the Company and its subsidiaries were misstating the liquidity and safety of ARS and the ARS market, and artificially supporting the ARS market to make it appear liquid. Further, the Individual Defendants made no attempt to implement measures to repurchase the illiquid ARS from customers once the ARS market had failed.

65.    Each of the Individual Defendants was 1) a Company director and/or senior officer at the time when the Company had both artificially supported the ARS market and misstated the liquidity and safety of the ARS market; and/or 2) a Company director and/or senior officer since the failure of the ARS market and during the time in which the Company has refused to buy back the illiquid securities from its customers.

66.    In breach of their fiduciary duty of good faith, the Individual Defendants willfully approved the Company's illicit and improper conduct and failed to make a good faith effort to remedy the situation.

67.    As a result of the Individual Defendants' misconduct, BB&T has sustained damages, including, but not limited to, costs and expenses incurred in connection with the legal action taken against BB&T and Scott & Stringfellow, as well as further investigation of the Company's unethical and illicit activities.

- 17 -

## DERIVATIVE AND DEMAND ALLEGATIONS

68.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

69.     Plaintiff is a shareholder of BB&T, was a shareholder of BB&T at the time of the wrongdoing alleged herein, and has been a shareholder of BB&T continuously since that time.

70.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

71.     On December 11, 2009, Plaintiff made a demand (the "Demand") on the Board to commence an action against the Individual Defendants. A copy of Plaintiff's demand is attached hereto as Exhibit A.

72.     On December 23, 2009, Frances B. Jones ("Jones"), General Counsel of BB&T, wrote a letter to Plaintiff's counsel acknowledging receipt of the Demand and stating that she would "refer it to [the Board]." Less than two months later, on February 18, 2010, Jones wrote a letter to Plaintiff's counsel stating that the Board "has considered the [Demand] and has determined that at this time, taking the requested action would not be in the best interests of [BB&T] or its shareholders." A copy of Jones' February 18, 2010 letter is attached hereto as Exhibit B.

73.     It is apparent from Jones' correspondence that the Board did not conduct any investigation of the Demand, did not appoint a committee of independent directors to investigate or consider the Demand, did not retain any independent counsel or other advisors to assist in investigating or considering the Demand, nor do anything other than refuse the Demand out of hand. There is no indication that the Board complied with any of the requirements of N.C. Gen. Stat. § 55-7-44(a) and (b). Specifically,

- 18 -

a. The Board did not "determine[] in good faith after conducting a reasonable inquiry upon which its conclusions are based that the maintenance of the derivative proceeding is not in the best interest of the corporation" because the Board conducted no "inquiry" at all, much less a "reasonable inquiry;" based its "conclusions" on nothing at all; and did not consider the Demand in "good faith" if it in fact considered the Demand at all;

b. There is no indication that the Board made its decision to refuse the Demand by a "majority vote of independent directors present at a meeting of the board of directors" because there is no indication that the Board held any meeting to consider and vote on the refusal of the Demand; and

c. The Board plainly did not decide to refuse the Demand based on a "majority vote of a committee consisting of two or more independent directors appointed by majority vote of independent directors present at a meeting of the board of directors" because the Board appointed no such committee.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

74. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

75. As alleged in detail herein, each of the Individual Defendants had a duty to, *inter alia*, exercise good faith to ensure that the Company and its subsidiaries were operated in a diligent, honest and prudent manner and, when placed on notice of improper or imprudent conduct by the Company, its employees, its subsidiaries and/or its or its subsidiaries' employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

76. The Individual Defendants knowingly implemented and engaged in the Company's and its subsidiaries' improper business practices, as alleged herein, breaching their fiduciary duties of loyalty and good faith.

77. As a result of the Individual Defendants' breaches of fiduciary duties, BB&T has sustained damages, as alleged herein.

- 19 -

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

C.    Appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties; and

D.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

This the 1st day of April, 2010.

/s/ Kevin B. Cartledge
NC State Bar #24167
Wilson Helms & Cartledge, LLP
110 Oakwood Drive, Suite 400
Winston-Salem, NC 27103
Telephone: (336) 631-8866
Facsimile: (336) 631-9770
Email: KCartledge@WHCLawFirm.com

/s/ Robin Winchester
Robin Winchester
James H. Miller
Barroway Topaz Kessler Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (267) 948-2512
Email: rwinchester@btkmc.com

Attorneys for Plaintiff

- 20 -

## VERIFICATION

I, Curtis Borchardt, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

DATE: MARCH 12, 2010

_____
CURTIS BORCHARDT